## CAMPBELLL v. NEWTON & DRISKILL *et al.*

No. 5235.    Opinion Filed November 2, 1915.

Rehearing Denied November 23, 1915.

(152 Pac. 841.)

1. **SALES—Fraud—Evidence—Excessive Price.** In the purchase of property, the mere fact that it was sold too high is not per se **prima facie** evidence of fraud in the consummation of the said sale.

2. **BILLS AND NOTES—Fraud—Waiver of Defense—Giving of Renewal Note.** If a party is induced by fraudulent acts to execute a note and afterwards renews the note, with full knowledge of the fraud, then such renewal would operate as a waiver of his right to urge the same as a defense against said renewal note.

3. **EVIDENCE—Statements of Conspirator—Admissibility—Preliminary Proof.** Before statements of one alleged conspirator are admissible in evidence against his alleged co-conspirator, the party offering the same must first made out a **prima facie** case of conspiracy **aliunde**, and, when such a **prima facie** case is made out, then the statement of one conspirator made during the pendency of the wrongful enterprise, before its consummation, and in furtherance of its object, will be received in evidence against his co-conspirator.

4. **PLEADING—Amendment of Answer—Repleading Defense Imperfectly Pleaded.** Defendants in their answer set up a plea of 'fraud and imperfectly also set up a plea of failure of consideration. After the verdict of the jury had been returned the court permitted the defendants to amend their answer by more fully pleading failure of consideration. Held, not error.

(Syllabus by Mathews, C.)

*Error from District Court, Canadian County;*
*John J. Carney, Judge.*

Action by C. B. Campbell against Newton & Driskill, a copartnership composed of J. A. Newton and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded.

*Bond, Melton & Melton,* for plaintiff in error.

*R. B. Forrest,* for defendants in error.

Opinion by MATHEWS, C.  This action was instituted in the district court of Canadian county upon a promissory note signed by defendants, a partnership, and payable to the First National Bank of Minco and indorsed to this plaintiff.  The note was dated November 20, 1911, and due January 1, 1912.  The defendants answered by (1) admitting the execution of the note, (2) general denial, (3) failure of consideration, (4) fraud in procuring their signature to the note, (5) failure to deliver the colts, for the purchase of which said note was executed, and (6) that plaintiff was not an innocent holder of said note.  The plaintiff replied by alleging that the consideration for the note sued on was a two-thirds interest in eight colts sold by the plaintiff to defendants and one John Gray; that, at the request of defendant Newton, plaintiff sold to the said defendants and John Gray said two-thirds interest in eight colts for $2,333.33 1-3, the plaintiff reserving a one-third interest in said colts; and that the said defendants took over the interest of the said John Gray in said colts and assumed and agreed to pay the joint indebtedness; and that afterwards, upon the suggestion and request of the defendant Newton, plaintiff advertised and sold said colts to the highest bidder at the Oklahoma City State Fair in 1912 for about $1,600, which, with the exception of the cost of said sale, was placed to the credit of the said Newton upon the purchase price for said colts; and that the note herein sued on was a renewal for the balance due on the original consideration.  Plaintiff in his reply further alleged that, long after the sale of said colts, the said Newton often promised and agreed to pay the balance due, and that defendants executed the note sued on to the First National Bank of Minco long after the transactions set up in his answer as

a defense had taken place and with full knowledge of the same, and that by reason of the renewal of said note, with such knowledge, the defendants have waived their plea of fraud as set up in their answer. The cause was tried to a jury, which returned a verdict in favor of defendants, and plaintiff brings error to this court.

1. Defendants in their pleadings and at the trial claimed that the plaintiff and one John Gray, the joint maker of the first note executed, entered into a conspiracy to defraud the defendants by selling the colts to the said Gray at an exorbitant price; the pleadings thereon being as follows:

"The said colts were not of the value of $3,600, nor near said amount; that in truth and fact the said colts were not worth a greater sum than $1,200 at said time, and the plaintiff and the said Gray well knew that they were worth no more, but with intent to cheat and defraud these defendants, and to obtain their names upon said notes, with the ulterior motive of forcing these defendants to pay said sum represented by said two notes, did then and there agree upon said consideration price of $3,600, and did then and there further agree as part of said conspiracy that the said Campbell should keep a one-third interest in said colts, and the said notes should represent the remaining two-thirds interest in said property ostensibly and fraudulently purported to be purchased by said Gray. And the defendants aver: That the said Gray and said Campbell did represent to defendants that said deal and transaction between them was *bona fide*, and request these defendants to indorse said two notes as surety on said Gray. That these defendants had no knowledge or information relative to any of said matters, and were totally in ignorance of said conspiracy and said fraudulent intent of the said Gray and said plaintiff, and being in such ignorance, and having faith and confidence in both of said parties, did consent to and did sign the said notes as sureties thereon. These defendants

further allege that thereafter the said Gray gave no further attention to said alleged deal relative to said colts, and did not then nor at any time thereafter take possession of said colts, and at no time exercised control thereof, but that they remained at all times in the possession and under the control of the plaintiff."

The plaintiff contends that the evidence introduced at the trial did not make out even a *prima facie* case of fraud and that it was error to submit this issue to the jury. An investigation of the evidence introduced at the trial leads us to the conclusion that plaintiff's contention is correct.

In order the better to understand the evidence we quote the substance of the evidence of J. A. Newton, who was the principal witness, at length:

"In 1909 and for several years before that, I knew Gray. He was connected with Campbell in the way of training horses for the track. I saw Gray driving and leading Campbell's horses about. I heard Gray and Campbell talking together about horses a number of times. Campbell told me Gray was one of the best horse trainers that he ever knew; that he was a failure as a race horse man in a way, that is, didn't make much money, but he was a great trainer. In 1909, John Gray came over to Minco. He came into my store, and he said he was practically broke, and he asked me if I would loan him some money to buy a race horse. I let him have a check for $200. A few days after that he wanted to buy eight colts that Mr. Campbell had, and he wanted me to go on the note with him. He said Campbell would not let him have charge of the colts, or he could not buy them, without me going on the note. I saw Mr. Campbell afterwards, and he said: 'John Gray is a good race horse man. He will pay this all out. He needs help.' John Gray came back the third time and told me, if I would go on the paper, that Campbell would take a third interest in the colts. He and I and Mr. Campbell talked

about it then.  Mr. Campbell said to Gray, 'Now, John, you'll go ahead with Netwon and make this deal and make this paper, and Mr. Newton sign it, and if any of the horses fail to make good in any way in your training I will take them back.'  Then John Gray and I signed the first note, some time in June, 1909.  The colts were out in C. B. Campbell's pasture.  I told them these sucking colts don't look to be worth such money, and they said: 'You know nothing about it; you don't know what they are worth'—and I didn't, of course.  John Gray said we were getting them cheap, and so did Campbell.  John Gray was doing all the dealing.  The colts were left on Campbell's farm during the winter.  At the time the notes were signed, it was agreed Campbell was to keep the colts there and turn them over to John Gray some time in the next summer.  Gray did not take possession of the colts in 1910, nor any time.  He never had charge of them at all.  Mr. C. B. Campbell was the only one who ever had control of them.  In the fall of 1910, he said he wasn't going to let Gray have the colts, so he took them to Oklahoma City at the October, 1910, fair, and put them up at public auction and sold them. I was present. $1,600 was realized.  Mr. Campbell kept the money. I made a note subsequent to that.  It was the renewal note now sued on growing out of this transaction.  I paid the interest for two years, and then they told me if I didn't pay the note they would sue me.  The last time the note was renewed, was a year ago this past November.  I wasn't at home, and Mr. Driskill renewed it, and I signed it afterwards.  Gray is now dead.  I talked to Campbell about the payment of the note after the summer of 1911.  I told him if he wouldn't sue me and ruin my credit, while the horses were sold high, maybe I could make a raise and I would pay this debt.  I did not tell Campbell he had worked a scheme to defraud me.  I told him the colts were sold high.  I think that was defrauding me.  That is my idea of fraud. John Gray was the man who bought these colts."

The principal defense advanced by defendants was that of fraud, and the only competent evidence pertaining to

fraud is the testimony of defendant J. A. Newton to the effect that the colts were sold at too high a price. This kind of evidence, standing alone and unsupported by evidence of other wrong conduct, does not make out such a case of fraud as justifies its submission to the jury. In other words, that the property was sold at an exorbitant price is not *per se* any indication whatever of fraud, and there is no competent evidence in this case, other than the statement of defendant, J. A. Newton, even that the colts were sold at an exorbitant price. It is well known that racing colts at that age have only a speculative value, and their real value depends almost wholly upon their showing after development and training. In the case at bar, the colts were shown to have a thoroughbred pedigree, and, while they only brought about $1,600 at the auction sale, there was evidence introduced at the trial showing that one of these colts was then worth between $1,500 and $2,000, and another between $1,000 and $1,200, and one of the same was a full brother to a horse that had been sold for $8,000.

Fraud is never presumed, but must be proven by the party pleading the same, and in this case defendants have signally failed to prove facts that raise even a suspicion of fraud.

2. The plaintiff next urges that, after defendants discovered the matters of fraud pleaded in their answer as a defense, they gave the renewal note sued on. The defendant Newton testified thereon as follows:

"Q. Mr. Newton, when this note was first renewed, did you have any knowledge of this fraud then? A. No, I did not. Q. When did you first find it out? A. It was a long time after that. Q. Was it in 1911? A. Well, along in the summer. Q. Can you give me anywhere near the exact time? A. Well, I think in June."

The transaction for the purchase of the colts was consummated about June, 1909, and the note was given then and was twice renewed; the last renewal being the note herein sued on, dated November 20, 1911. It appears that the defendant John Gray died prior to the renewal, and the defendants alone signed the same. Even conceding that the facts presented by defendants constitute fraud, full knowledge thereof was brought to the attention of defendants long prior to the renewal of the note sued on, and, if defendants elected to sign a renewal note under those circumstances, they waived their right to urge the same as a defense against said renewal note.

3. During the trial, the defendant Newton was permitted, over the objection of plaintiff, to detail conversations had between himself and said John Gray relative to his signing the note as alleged as surety for the said Gray. The depositions of one D. B. Freeman were also introduced over the objection of plaintiff, which detailed a conversation he had with the said John Gray in Dallas, Tex., in June, 1909, relative to the purchase of the colts from the plaintiff. In each of these cases, the testimony was admitted upon the theory that a conspiracy existed between the said John Gray and plaintiff to defraud the defendants in the sale of the colts. Before such testimony is admissible, it is the duty of the party offering the same to first make out a *prima facie* case of conspirary *aliunde*, and, when such a *prima facie* case is made out, then the statements of one conspirator, made during the pendency of the wrongful enterprise, before its consummation, and in furtherance of its object, will be received in evidence against his co-conspirator. But in this case, as stated before, the defendants had failed to lay the predicate for the proper admission of the testimony, by first presenting such testimony as

would warrant the court in finding that such a conspiracy actually existed. Having failed to do this, the admission of the foregoing testimony was error. 3. Ency. of Evidence, p. 429; *Bennett v. State*, 62 Ark. 516, 36 S. W. 947; *State v. McGee*, 81 Iowa, 17, 46 N. W. 764; *Samples v. People*, 121 Ill. 547, 13 N. E. 536; *Miller v. Dayton*, 57 Iowa, 423, 10 N. W. 814; *Loggins v. State*, 8 Tex. App. 434; *State v. Corcoran*, 7 Idaho, 220, 61 Pac. 1034; *State v. Rogers*, 54 Kan. 683, 39 Pac. 219; *Stratton v. Oldfield*, 41 Neb. 702, 60 N. W. 82; *State v. Palmer*, 79 Minn. 428, 82 N. W. 685.

4. After the jury had returned its verdict, the court permitted the defendants to file the following amendment to their answer:

"These defendants allege that at the time of the making of the original note, of which the note herein sued upon is but a renewal, it was agreed, and such agreement was a part of the consideration of said note, that the said John Gray should and would train the said colts for racing purposes; and the plaintiff specifically agreed that said Gray might and should have the possession of said colts after the 1st day of July, 1910, for the special purpose of training the same; that notwithstanding said agreement and undertaking of the plaintiff, on and after the 1st of July, 1910, the plaintiff at all times refused to allow the said John Gray to take or to have the said colts for training. And these defendants say that by reason of said acts of refusal the value of said colts was depreciated, and the consideration of this agreement, by said act of the plaintiff, failed."

The plaintiff contends that this amendment changed the defense in the case, and that it was error for the court to permit the same.

Section 4790, Rev. Laws 1910, permitting amendments, so far as applicable here, is as follows:

"The court may, before or after judgment, in further-ance of justice, and on such terms as may be proper, amend any pleading, process or proceeding, * * * by inserting other allegations material to the case, or conform the plead-ing or proceeding to the facts proved, when such amend-ment does not change substantially the claim or defense."

In defendants' original answer, they pleaded failure of consideration and also the following:

"These defendants further allege that thereafter the said Gray gave no further attention to said alleged deal rela-tive to said colts and did not then nor at any time there-after take possession of said colts, and at no time exer-cised control thereof, but that they remained at all times in the possession and under the control of the plaintiff."

The amendment aforesaid cannot be held to be the in-troduction of a new defense or a change in defense, but a repleading or enlargement of the defense of failure of con-sideration, already somewhat imperfectly pleaded, and we believe it was permissible.

The case of *Fort Produce Co. v. Southwestern Grain & Produce Co.*, 26 Okla. 13, 108 Pac. 386, is in point, but the reverse of the case at bar, the syllabus of that case being as follows:

"Plaintiffs brought an action to recover damages re-sulting to them from a purchase of a car load of potatoes sold to them by defendant upon the representation and guaranty that they were sound and merchantable; whereas, a great portion of them were rotten, grubby, and unmer-chantable. They were permitted to amend their petition to allege that defendant so loaded the car that plaintiffs could inspect only the top of same before they were com-pelled to pay for the car, and that he fraudulently, with the purpose and design to deceive the plaintiffs, had placed upon the top of the car sound potatoes and in the bottom of the car rotten and unmerchantable potatoes, and because of said acts they were damaged, and prayed for damages re-

sulting from the fraudulent acts of defendant. *Held,* that the court did not err in permitting the amendment."

It is thus seen from the case last above referred.to that there is such a close analogy between fraud and failure of consideration' that it was held therein that it was not a changing of plaintiff's claim to permit an amendment setting up the plea of fraud, after having first pleaded a breach of warranty. *Terrapin v. Barker,* 26 Okla. 93, 109 Pac. 931; *Herron v. M. Rumley Co.,* 29 Okla. 317, 116 Pac. 952; *Trower v. Roberts,* 30 Okla. 215, 120 Pac. 617; *Penn v. Penn,* 37 Okla. 651, 133 Pac. 207.

We recommend that the judgment be reversed and remanded, with instructions to the trial court to proceed in accordance with this opinion.

By the Court:    It is so ordered.